IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | | |
|---|---|---|
| Ramona G., ) | | |
|     Plaintiff, ) | Civil Action No. 5:22-cv-00041 | |
| ) | | |
| v. ) | REPORT & RECOMMENDATION | |
| ) | | |
| Martin O'Malley, ) | By:    Joel C. Hoppe | |
| Commissioner of Social Security, ) |         United States Magistrate Judge | |
|     Defendant. ) | | |

Plaintiff Ramona G. asks this Court to review the Commissioner of Social Security's final decision denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–434. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the parties' briefs, and the applicable law, I find that the Commissioner's final decision is supported by substantial evidence. Accordingly, I respectfully recommend that the presiding District Judge affirm under the fourth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89 (1991)).

1

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th

Cir. 2017); 20 C.F.R. § 404.1520(a)(4).[1] The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Ramona filed for DIB in December 2019. *See* Administrative Record ("R.") 230–36, ECF No. 9. She alleged she became disabled on September 10, 2018, R. 230, because of fibromyalgia, bipolar disorder, anxiety, post-traumatic stress disorder ("PTSD"), and depression, R. 255. Ramona was forty-three years old at her alleged disability onset date, R. 78, or a "younger person" under the regulations. 20 C.F.R. § 404.1563(c). Disability Determination Services ("DDS"), the state agency, denied her claims initially in August 2020, R. 78–92, and upon reconsideration in February 2021, R. 94–102. On November 2, 2021, Ramona appeared with counsel and testified at an administrative hearing before ALJ Donna Edwards. *See* R. 28–75. A vocational expert ("VE") also testified at this hearing.

ALJ Edwards issued an unfavorable decision on December 6, 2021. R. 10–23. First, she found that Ramona had not engaged in substantial gainful activity since September 10, 2018. R. 13. At step two, the ALJ found that Ramona had severe medically determinable impairments of fibromyalgia, obesity, and anxiety. *Id.* Ramona's other medical conditions did not have more than a minimal effect on her functional abilities during the relevant period, and, thus, were non-severe impairments. *Id.* Her severe impairments did not meet or medically equal a relevant Listing. *See* R. 14–16 (citing 20 C.F.R. pt. 404 subpt. P, app. 1 § 12.06 and SSR 19-2p). As part of her Listings analysis, ALJ Edwards found that Ramona's severe anxiety caused "moderate"

---

[1] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

3

overall limitations in understanding, remembering, or applying information; interacting with others; adapting or managing herself; and concentrating, persisting, or maintaining pace. *Id.*

The ALJ then determined that Ramona had the residual functional capacity ("RFC") to perform "light work,"[2] except she could "lift and carry up to 20 pounds frequently," "sit 8 hours out of an 8-hour workday, stand 6 hours out of an 8-hour workday, and walk 6 hours out of an 8-hour workday." R. 16. She had some limitations on using her bilateral extremities and could not work around unprotected heights or moving machinery. *Id.* Ramona could "understand, remember, and carry out simple instructions," "perform simple, repetitive, and routine tasks," "occasionally interact with the public," and "tolerate occasional change." *Id.* She could not do any "production rate pace work [*i.e.*, assembly line and quota work]," but she could "perform goal-oriented work." *Id.*

This RFC ruled out Ramona returning to her past relevant work. R. 21. Relying on the VE's testimony, however, ALJ Edwards found that this RFC would allow Ramona to perform certain unskilled light occupations (office cleaner, garment bagger, inspector) that offered a significant number of jobs in the national economy. R. 22–23 (citing R. 60–63). Accordingly, the ALJ found that Ramona was not disabled during the relevant period. R. 23. The Appeals Council denied Ramona's request to review the ALJ's decision, R. 1–4, and this appeal followed.

III. Discussion

Ramona challenges the ALJ's RFC determination as to her mental impairments and limitations, in particular the purported failure to adequately account for her provider's

---

[2] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). A person who can meet these strength demands can perform "[t]he full range of light work" only if he or she can also "stand or walk for up to six hours per workday or sit 'most of the time with some pushing and pulling of arm or leg controls.'" *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010) (quoting 20 C.F.R. § 404.1567(b)); *see* SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983).

4

medication changes. Pl.'s Br. 11, ECF No. 12.[3]

A.  *Summary*

    1.  *Treatment Records*

In December 2008, Ramona saw Frank Ratchford, M.D., for a follow-up of her ongoing back pain. R. 370–71. Dr. Ratchford discussed "stress[,] anxiety[,] and depression [as] possibly related to her pain." R. 371. Ramona reported having side-effects to her medications, and her husband said that her doctor changed her medications "every couple of weeks" before she could "determine whether they were helpful or not." *Id.*

In September 2020, Ramona had her first office visit with Sherry Whisenant, M.D. R. 421–22. Her primary complaint was sinus pain, but she also reported a history of "mental health issues." R. 421. Dr. Whisenant noted Ramona's report that she "ha[d] not seen a doctor in 10 y[ea]rs due to lack of health insurance and [was] no longer followed by a psychiatrist." *Id.* Ramona's mental status exam was normal, and Dr. Whisenant recommended that she follow up with a psychiatrist "given her history of PTSD." R. 422 (cleaned up). At a follow-up appointment in October 2020, Jeffery Groesbeck, D.O., noted that Ramona reported "terrible" sleep, R. 418, and her mood and affect were "anxious," R. 419. Regarding her fibromyalgia, Dr. Groesbeck "[d]iscussed how anxiety and history of trauma have likely contributed and that those things need[ed] to be addressed if she is to expect to gain functionality and any pain control." R. 419. Ramona saw Dr. Groesbeck in October 2020 for fibromyalgia, chronic right knee pain, chronic left shoulder pain, bipolar disorder, and muscle spasm. R. 414–15. On her physical exam, Dr. Groesbeck found Ramona to have an "[a]nxious affect" and that she was "alert and oriented x 3." R. 414; *see also* R. 413. He noted, "little hope for real improvement until she

---

[3] My discussion of the record focuses on Ramona's mental impairments and limitations.

embraces the need to address mental health and lifestyle issues that contribute to her symptoms." R. 415. Dr. Groesbeck also recommended that she follow up with a psychiatrist for her mental health issues. R. 415.

Ramona saw Russell B. McKelway, M.D., and Rebekah Jordan, N.P., for psychiatric treatment about once a month from November 2020 through August 2021. *See* R. 514–70 (Ex. 14F). On initial evaluation, Ramona indicated a fear of medications "because many were tried rapidly on her in the past," and she had "a negative experience with Chantix that gave her suicidal ideations." R. 554. Nevertheless, she was "willing to retry medications again." *Id.* Ramona also admitted to "self medicating with alcohol." *Id.* She was previously hospitalized "for attempted suicide while on Chantix." R. 556. Ramona had also tried Wellbutrin, Lithium, Xanax, Klonopin, Zoloft, Depakote, and Gabapentin, with varying outcomes that were either not effective or partially effective. R. 558. On mental exam, NP Jordan noted that Ramona was hyperactive; her attention and concentration were alert and mildly distracted; and her recent memory was intact. R. 565. Her mood was "anxious," her affect was "alert congruent with anxiety," and she was "appropriate to situation." R. 566. Ramona's insight was "limited" and "clouded by negative past associations and anxiety." *Id.* She was diagnosed with persistent mood affective disorder and prescribed Lamictal for mood disorder and anxiety and Gabapentin for anxiety. R. 569.

Ramona had a follow-up appointment in January 2021.[4] R. 547. On mental status exam, Ramona's mood was "anxious with oscillating feelings," her recent memory was "poor," her remote memory was "impaired," and her concentration was alert and mildly distracted. R. 550.

---

[4] The treatment note from Ramona's January 2021 appointment states that it was her fifth visit, R. 550, but the record contains no notes from her second, third, or fourth visit. This note indicates that Ramona's medications were changed at least once after the first visit in November 2020. *See* R. 550, 571.

6

Her judgment was also minimally impaired, and her insight was limited. *Id.* All other findings were normal. *Id.* "She [was] frustrated with everything." *Id.* Ramona had stopped taking Gabapentin after running out, then resumed taking it, but noticed no difference in her anxiety or sleep. *Id.* She said Seroquel was "too expensive and she [was] still not sleeping," but Propranolol was helping her anxiety. *Id.* Ramona's providers stopped prescribing Gabapentin and added Trileptal. R. 551. At a tele-medicine appointment in February 2021, the provider noted that Ramona's mood and affect were "depressed," her concentration was "alert, more focused," and her recent and remote memory were both "poor." R. 544. Ramona reported having "racing thoughts," feeling overwhelmed, and having difficulty sleeping. *Id.* She experienced "panic" twice a week and had "feelings" in large, noisy crowds. R. 545. The provider increased the dose of Trileptal and prescribed Zyprexa for racing thoughts and sleep problems. *Id.*

During an appointment in March 2021, the provider noted that Ramona's mood was "labile yet less intense swings" and her affect was "alert[,] congruent with oscillating mood but less extremes." R. 539. Her recent and remote memory were both "intact," and her concentration was "alert, more focused." *Id.* She was "more calm and focused during [the] session." R. 540. She found it "easier to fall asleep" and was "feeling a little more rested," but she also cried, felt angry, and had racing thoughts. *Id.* Her provider increased Ramona's dose of propanol, Zyprexa, and Lamictal, to reduce "irritability and racing thoughts." *Id.* At a follow up in April 2021, Ramona seemed "more depressed," and her remote memory was "poor." R. 533. Her sleep had improved, and although her racing thoughts continued, they were milder. R. 534. She had a hard time focusing. *Id.* She had fewer crying moments, and her feelings of panic had lessened, but she continued to feel overwhelmed. *Id.* Ramona's provider increased her dosage of Zyprexa and Lamictal. *Id.* At an appointment in May 2021, Ramona's symptoms were largely the same. Her

7

provider reduced the dose of Propranol and prescribed Guanfacine for "presumed [Attention Deficit Hyperactivity Disorder] ADHD." R. 528. At a virtual appointment in June 2021, exam findings were mostly normal, but also showed continued depression and conflicting observations of her concentration, which was noted to be "poor," but also "alert, more focused." R. 522. Her dose of Lamictal was reduced "to see if it [was] increasing her CNS Depression." R. 523. At a virtual appointment in August 2021, Ramona reported poor concentration, less social anxiety, better sleep, less panic, and fewer crying moments and feelings of being overwhelmed. R. 516–17. Ramona was prescribed Naltrexone to help reduce her alcohol consumption and Buspar. R. 517.

In August 2021, Ramona saw Paul Ruscito, LPC. She sought "outpatient counseling for support in dealing with emotional difficulties." R. 572. Ramona reported multiple traumas, problems with chronic pain, anxiety, depression, and "a tendency to internalize her emotional stress." *Id.* LPC Ruscito noted that Ramona's mood was "anxious" and "depressed," and her affect was "constricted." R. 573. Her judgment was good, memory was intact, attention was good, and thought process and content were normal. *Id.* At a second counselling session, Ramona presented as both depressed and anxious with constricted affect. R. 574. She also "described difficulties concentrating and overactive, distracted thinking." *Id.* She scheduled a follow-up counseling session.

2. *Medical Opinions*

On June 4, 2020, Miles Diller, Ph.D., conducted a psychological evaluation of Ramona for the Virginia Department of Rehabilitative Services and wrote a report. R. 388–91. Ramona told Dr. Diller that her fibromyalgia "exacerbate[d] all the underlying mental [and] psychological problems," because she was "in pain all the time." R. 388. She had bipolar disorder, PTSD, and

8

"severe" anxiety. *Id.* She reported "sometimes" being unable to do anything, while "other days [she] c[ould] do everything." *Id.* Sometimes she went "days with poor sleep." *Id.* She reported feeling depressed and worthless "all the time." *Id.* She disliked "being in public" and "crowds" because "[p]eople are rude and stupid" and she "get[s] angry." *Id.* She tried not to leave her house. *Id.* Ramona experienced "[a]nxiety, panic attacks," and feeling like her "heart [was] going to jump out of [her] skin [and] [her] head might explode." *Id.* These feelings were "[t]otally random." *Id.* She attempted suicide twelve years ago and was hospitalized. *Id.* She last worked over a year earlier, but her "body could not handle it." *Id.* She got along well with others at work. *Id.* Ramona also helped take care of her one-year-old grandson, three cats, and one dog. *Id.* She did not have health insurance, and she was not taking "any psychoactive medication." R. 389; *see* R. 570 (Nov. 2020). She had attended counseling in the past, but did not find it helpful. R. 389.

On mental status examination, Dr. Diller noted that Ramona was fully oriented and her remote memory, fund of knowledge, concentration/working memory, abstract reasoning skills, judgment, and verbal reasoning were good. R. 389–90. Ramona's affect was restricted, and her mood was tense. *Id.* Overall, Dr. Diller found Ramona's mental status to be in the "good to fair range." *Id.* He diagnosed her with generalized anxiety disorder; panic disorder; and major depressive disorder, mild to moderate, recurrent. *Id.* He explained that Ramona was "often tense, anxious, on edge, ha[d] panic attacks on a regular basis, and sometimes experience[d] significant depression [and] lethargy." *Id.*

Dr. Diller opined that Ramona's prognosis was "fair to poor" because she was "not in treatment, ha[d] significant mental health problems, but also complain[ed] of pain." R. 390–91. He noted that while she did not work because of pain, "she was able to work in the past despite

9

her mental health problems." R. 391. Dr. Diller opined that Ramona was "mildly"[5] impaired in her abilities "to understand and remember instructions, locations, and work-like procedures" and "to get along with coworkers, respond appropriately to supervision, maintain socially-appropriate behavior[,] and adhere to the basic standards of neatness and cleanliness." *Id.* Ramona was "mildly to moderately" impaired in her abilities "to carry out instructions, sustain a normal routine without special supervision[,] and maintain attention and concentration." *Id.* She was "moderately" impaired in her abilities "to maintain regular attendance in the workplace" and "complete a normal workday or workweek without interruptions from a psychiatric condition." *Id.* Overall, Ramona had "moderate impairment level for functioning in full-time employment within a competitive work environment," which was "based on her anxiety, panic[,] and depression." *Id.*

Stephanie Fearer, Ph.D., reviewed Ramona's records for DDS in August 2020. R. 78–92. Assessing Ramona's mental RFC, Dr. Fearer determined that Ramona was "moderately" limited in her abilities to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or in proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, and respond appropriately to changes in the work setting. R. 88–89. Dr. Fearer opined that Ramona retained "the ability to perform simple, routine work with limited contact

---

[5] Dr. Diller's report defined three categories of adaptive and functional capacity:
    Mild = Almost no interference[.]
    Moderate = Some problems that might be successfully dealt with through modifications or accommodations.
    Marked = Problems that would preclude employment.
R. 390.

10

with the public." R. 90.

On reconsideration review for DDS, Leslie Montgomery, Ph.D., affirmed Dr. Fearer's findings and added moderate limitations in the abilities to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. R. 99–100. More specifically, Dr. Montgomery opined that Ramona could "perform 1–3 step tasks independently," "attend/concentrate for 2hr periods in order to complete an 8hr workday," and "maintain attendance and punctuality with only 1–2 problems per month due to depression and anxiety." R. 100. She could "perform at a generally consistent pace with others, with only minimal need for accommodations on an infrequent basis." *Id.*

3. *Subjective Statements*

Ramona completed function reports in February 2020 and February 2021. R. 276–83, 310–17. Describing her daily activities, Ramona said she made coffee, tended to animals, cleaned the kitchen, made meals, and worked on projects. R. 276–77. On some days she took care of her grandson, feeding him, changing his diaper, and playing with him. *Id.* Some days she could do only a "couple things." R. 276. She took care of her dog and cats, and she handled her own personal care, except sometimes she had trouble lifting one arm above her head. R. 277. Ramona enjoyed "sewing, crafting, reading, [and] cooking," and she did them "often" and "fairly well." R. 280. Ramona spent time with family and other people and communicated with them by phone or email "a few times a month," R. 280, 314, and she interacted with her family at home every day, *id.* Although she sometimes felt stressed or anxious in loud crowded areas, she got

11

along well with others. R. 314. Her impairments affected her abilities to lift, squat, bend, stand, reach, walk, sit, kneel, talk, climb stairs, see, memorize, complete tasks, concentrate, understand, follow instructions, use her hands, and get along with others. *Id.* She could not pay attention for "very long but [she] c[ould] force it." *Id.* Ramona also did not follow spoken instructions very well, "unless it [was] very brief," and she could follow written instructions "very well as long as [she] can keep looking at it." *Id.* She did not handle stress or changes in routine very well. R. 282.

On November 2, 2021, Ramona testified at an administrative hearing. R. 28–75. Ramona said she took care of her grandson twice a week while her daughter worked, and she had help from her husband and son. R. 40–41. Her mental health issues affected her on a day-to-day basis because she was "almost always anxious for no reason," and "stay[ed] depressed." R. 48–49. Her depression limited her to doing "the bare minimum," and she had to take medicine before going out in public, but she still got angry, frustrated, and anxious. R. 49. Dr. McKelway changed her medication several times, which helped, but was "still not where it need[ed] to be" and was a "long process." R. 49–50. She was tired, her sleep was poor, and she needed to nap every day. R. 50.

B.   *The ALJ's Decision*

ALJ Edwards summarized much of this evidence in her written decision. *See* R. 14–21. As a part of her RFC analysis, ALJ Edwards found that the medical evidence established that Ramona's fibromyalgia, obesity, and anxiety "could reasonably be expected to cause the alleged symptoms," but her "statements concerning the intensity, persistence[,] and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. 17.

First, ALJ Edwards discussed Ramona's fibromyalgia history and treatment. *See id.* (citing R. 393, 395, 396, 393–99, 437). She noted that Ramona "had not taken prescribed pain medications since 2011 due to a loss of medical insurance." *Id.* (citing R. 393). She also noted that Ramona's treating provider "had 'little hope' for real improvement in her pain symptoms until [Ramona] addressed her mental health and other lifestyle issues." *Id.* (citing R. 415).

Turning to the records of Ramona's treatment for anxiety, ALJ Edwards recounted Dr. Diller's consultative psychological examination findings and NP Jordan's mental status examinations. R. 18 (citing R. 388–91; 516, 544, 545, 550, 553, 565, 567, 571). The ALJ noted mixed findings and observations that medication changes led to some improvement in Ramona's focus and anxiety. *Id.*

ALJ Edwards then summarized some of Ramona's subjective statements regarding her symptoms. *See id*. She noted Ramona's ability to "prepare her own simple meals" and "perform household tasks such as cleaning and laundry." *Id.* (citing R. 278). ALJ Edwards also noted that Ramona reported, "she could help take care of her one-year-old grandson, three cats, and one dog." *Id.* (citing R. 389).

ALJ Edwards also evaluated the medical-opinion evidence. *See* R. 18–20. As to Ramona's mental impairments, Dr. Fearer and Dr. Montgomery opined that Ramona "could perform simple, routine work in a setting with limited public contact" and had other mild and moderate limitations. *Id.* ALJ Edwards found their opinions "generally persuasive . . . and mostly consistent with, and supported by, the evidence of record," but she deviated from their opinions somewhat, explaining that she determined the evidence showed moderate, rather than mild, limitations. *Id.* ALJ Edwards then evaluated Dr. Diller's medical opinion, finding it "partially persuasive." R. 19–20. As with the DDS opinions, ALJ Edwards found Dr. Diller's opinion that

Ramona had some mild limitations was not supported by the record. R. 20. She noted that Ramona had "required frequent medication adjustments," medical records showed Ramona had "fair remote memory" and "limited insight," and Dr. Diller found some moderate limitations. *Id.* The ALJ determined that such evidence demonstrated that Ramona's anxiety was a "severe" MDI. *Id.*

As to the RFC, the ALJ explained that she limited Ramona to light work to address her fibromyalgia symptoms. R. 21. She added postural and manipulative limitations to accommodate Ramona's global-pain symptoms and her non-severe impairments. *Id.* To account for Ramona's severe mental impairment of anxiety, the ALJ limited her to "simple instructions, routine and repetitive tasks, and no production rate pace"; occasional interaction with the public to address her problems being around people" and "occasional change." *Id.* Considering the RFC and the testimony of the VE, the ALJ determined that Ramona could perform several representative occupations and, thus, was not disabled.

C. *Discussion*

Ramona challenges ALJ Edward's mental RFC findings and her consideration of the VE's testimony. A claimant's RFC is his or her "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite his or her medical impairments, symptoms, and treatment. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence in the case record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011), and it should reflect specific, credibly established "restrictions caused by medical impairments and their related symptoms" that affect the claimant's "capacity to do work-related physical and mental activities" on that basis, SSR 96-8p, 1996 WL 374184, at *1, *2. See *Mascio v. Colvin*,

14

780 F.3d 632, 637–40 (4th Cir. 2015).

The Commissioner "has specified the manner in which an ALJ should assess a claimant's RFC." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). First, because RFC is by definition "a function-by-function assessment based upon all of the relevant evidence of [the claimant's] ability to do work related activities," SSR 96-8p, 1996 WL 374184, at *3, the ALJ must identify each impairment-related functional limitation that is supported by the record, *see Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016). Second, the ALJ must provide a "narrative discussion describing" how specific medical facts and non-medical evidence "support[] each conclusion" in the RFC assessment, SSR 96-8p, 1996 WL 374184, at *7, and logically explaining how she weighed any conflicting or inconsistent evidence in arriving at those conclusions, *Thomas*, 916 F.3d at 311. Generally, a reviewing court will affirm the ALJ's RFC findings when she considered all the relevant evidence under the correct legal standards, *see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017), and built an "accurate and logical bridge from that evidence to h[er] conclusion[s]," *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018). *See Thomas*, 916 F.3d at 311–12; *Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 663 (4th Cir. 2017).

ALJ Edwards's decision satisfies this "deferential" standard of review. *See Jarvis v. Berryhill*, 697 F. App'x 251, 252 (4th Cir. 2017) (per curiam). The ALJ discussed Ramona's subjective statements about the symptoms and limitations caused by her anxiety. R. 14–15, 17. She also discussed the mixed findings in treatment records. R. 14–15, 17–18. She noted that at some appointments Ramona had restricted affect, tense mood, impaired judgment, limited insight, mild distractibility, and hyperactivity. R. 14–15, 18. On the other hand, at other appointments, Ramona had normal speech, appropriate attitude, labile mood with less intense

15

mood swings, logical and relevant thoughts, and intact memory; she was alert and more focused, *id.*; and she scored 29/30, or normal results, on mini-mental state examination, R. 14, 19 (citing 389–90). The ALJ acknowledged Ramona's treatment with psychotropic medications and her testimony and treatment records noting changes to her medications. R. 17, 18. The ALJ also noted Ramona's report that her symptoms had improved with medication. R. 18 (citing R. 527, 545). *See Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling."). Ramona testified that the medication changes were helping, "but it's still not where it needs to be. We're still working on it. It's a long process." R. 50–51. Ramona's testimony tends to show that despite medications and treatment for her mental impairments, she still had symptoms. Even so, Ramona did "not have to be [symptom]-free in order to be found 'not disabled'" during the relevant time. *Green v. Astrue*, No. 3:10cv764, 2011 WL 5593148, at *4 (E.D. Va. Oct. 11, 2011) (citing *Hays v. Sullivan*, 907 F.2d 1453, 1457–58 (4th Cir. 1990)), *adopted by* 2011 WL 5599421 (E.D. Va. Nov. 17, 2011).

Furthermore, the evidence supports the ALJ's finding that medications and treatment were effective and improved Ramona's symptoms. In some cases, a doctor's medication adjustments may show that treatment is not effective and a patient's symptoms are not controlled. Such circumstances may provide some evidence to support assessing the patient with significant limitations. *See Shelley C. v. Comm'r of Soc. Sec. Admin.*, 61 F.4th 341, 363 (4th Cir. 2023) (noting "cases where claimants consume antidepressant, anticonvulsant, and/or antipsychotic drugs, consistently attend visits with mental health professions, and endure constant medication adjustment and management, their treatment is classified as anything but 'routine and conservative.'"); *Elizabeth G. v. Saul*, No. 5:18cv00145, 2020 WL 3108707, *8

16

(W.D. Va. Mar. 5, 2020). However, the record here shows that medication adjustments and other routine outpatient treatment improved Ramona's symptoms.

As to Ramona's activities of daily living, the ALJ accurately noted that Ramona reported performing modest household tasks and helping take care of her grandson and pets. R. 18. She also had several hobbies, such as "sewing, crafting, reading, [and] cooking," that she did "often, and she spent time with family and other people. R. 280, 314. Ramona's modest activities provide some support for the ALJ's RFC assessment. *See Renee R. v. Kijakazi*, No. 4:21cv00023, 2022 WL 3446200, at *2 (W.D. Va. Aug. 17, 2022) (Plaintiff's child care and other activities provided evidence that she was not limited to only "minimal" activity and showed "more extensive" activities than plaintiff's testimony otherwise suggested.).

Lastly, the ALJ discussed the medical opinion evidence. She found the DDS psychologists' and Dr. Diller's opinions partially persuasive. Where the ALJ differed with the doctors' assessments was in finding Ramona's limitations somewhat greater than the doctors had assessed. Considering the medical opinion and citing portions of the treatment record, the ALJ found that Ramona's limitations caused by her mental impairments were moderate, rather than a combination of moderate and mild as assessed by the doctors. Notably, the ALJ's RFC is more restrictive than any medical opinion in the record—including as it relates to Ramona's ability to stay on task while doing unskilled work. For example, the ALJ found she could not do "production rate pace work" involving assembly lines or production quotas, which none of the medical sources identified. Her assessment of the medical opinions is reasonable and supported by the record, and Ramona does not challenge it.

The ALJ analyzed Ramona's subjective statements, her treatment records, her activities of daily living, and the medical opinions, and she assessed an RFC that logically relates to that

evidence. She limited Ramona to performing simple tasks with simple instructions; goal-oriented, but not fast-paced work; occasional interaction with the public; and occasional changes. The ALJ adequately explained her RFC assessment, and she supported that assessment with substantial evidence in the record.

Nevertheless, Ramona contends that because of a hypothetical posed by the ALJ to the VE, the ALJ's RFC explanation is lacking. Pl.'s Br. 11. She takes issue with the ALJ's failure to adopt the limitations identified in following hypothetical to the VE:

> ALJ: Okay, I'm going to add one limitation to that RFC. And the one limitation is going to be that in addition to normal breaks, the claimant would be expected to be off task 15% of an eight-hour workday. And I'm going to note that that's due to the instability of symptoms as reflected in the multiple, fairly consistent medication -- psychotropic medication changes with the -- my finding in connection with that, that the inability properly control the symptoms suggest that they would appear, not necessarily with any -- they could appear any time. No -- without predictability such that they would interfere with the claimant's ability to carry out her -- to maintain consistenc[y] and pace and carry out her assigned tasks. Having said that, would. . . the claimant be able to perform her past-relevant work?
>
> VE: No, Your Honor.
>
> ALJ: . . . Would any jobs exist in the national economy for such a hypothetical individual to perform?
>
> VE: No, Your Honor.

R. 70–71; *see also* R. 66–69 (attorney's summary and argument).

As part of the step five assessment, an ALJ may employ a VE to present testimony about "whether there is work available in the national economy which this particular claimant can perform." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). That testimony is usually based on the ALJ's hypothetical or multiple hypotheticals posing the claimant's vocational profile and varying limitations that reflect differing potential RFC determinations. *See id.* The above quoted hypothetical was one of several that the ALJ and Ramona's attorney presented to the VE. The

18

ALJ also presented to the VE a hypothetical that reflected the RFC that the ALJ detailed in her written opinion. *Compare* R. 60–62, *with* R. 16.[6] In response, the VE testified that representative jobs would be available considering the worker's characteristics in several hypotheticals and for other hypotheticals that no jobs were available. The ALJ could properly choose between the hypotheticals as long as that choice was supported by substantial evidence. *See Hailey v. Comm'r of Soc. Sec.*, 284 F. App'x 100, 104–05 (4th Cir. 2008); *see also Kessans v. Comm'r of Soc. Sec.*, 768 F. App'x 531, 535–36 (6th Cir. 2019) ("[I]t is the ALJ's role to determine what medical restrictions claimant was under and how they affected his residual functional capacity, and then to determine whether the vocational expert had identified a significant number of jobs in a relevant market given these restrictions."). The ALJ did not have to adopt the hypothetical that Ramona now promotes on appeal. *See* Pl.'s Br. 6–7. As discussed above, the ALJ explained why she adopted the RFC and supported that explanation with ample evidence in the record, and that RFC substantially matched the first hypothetical. *See Johnson*, 434 F.3d at 659 (finding no error where ALJ's hypothetical to VE adequately reflected the claimant's RFC and that RFC was supported by substantial evidence). Accordingly, I find that the ALJ's decision is supported by substantial evidence.

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **DENY** Ramona's Motion for Summary Judgment, ECF No. 11; **GRANT** the Commissioner's Motion for Summary Judgment, ECF No. 14; **AFFIRM** the Commissioner's final decision denying Ramona's DIB claim; and **DISMISS** this case from the Court's active docket.

## **Notice to Parties**

---

[6] The hypothetical did not identify any ability to walk during an eight-hour workday. *Compare* R. 60–62, *with* R. 16. Ramona does not assign error to that omission.

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: February 16, 2024

Joel C. Hoppe
United States Magistrate Judge